UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X
                                     :
J. BRIAN HURD,                       :      Case No.:
                                     :
            Plaintiff,               :      **COMPLAINT**
                                     :
      vs.                            :      **DEMAND FOR JURY TRIAL**
                                     :
DOVA PHARMACEUTICALS INC., DAVID     :
ZACCARDELLI, STEVEN M. GOLDMAN,      :
ROGER A. JEFFS, PAUL B. MANNING,     :
ALFRED J. NOVAK, SEAN STALFORT, and  :
NANCY WYSENSKI,                      :
                                     :
            Defendants.              :
                                     :
------------------------------------ X

Plaintiff J. Brian Hurd ("Plaintiff"), by and through his attorneys, alleges the following

upon information and belief, including investigation of counsel and review of publicly-available

information, except as to those allegations pertaining to Plaintiff, which are alleged upon

personal knowledge:

## <u>NATURE OF THE ACTION</u>

1.       This is an action brought by Plaintiff against Dova Pharmaceuticals, Inc. ("Dova"

or the "Company") and the members of the Company's board of directors (collectively referred to

as the "Board" or the "Individual Defendants" and, together with Dova, the "Defendants") for their

violations of Sections 14(d)(4) and 14(e) of the Securities Exchange Act of 1934 ("Exchange

Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), respectively, and United States Securities and

Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9 ("Rule 14d-9").  Plaintiffs'

claims arise in connection with the proposed tender offer ("Tender Offer") by Swedish Orphan

Biovitrum AB (publ), a Swedish public limited liability company ("Parent"), through its subsidiary

Dragonfly Acquisition Corp. ("Purchaser," and collectively with Parent, "Sobi"), to acquire all of the issued and outstanding shares of Dova (the "Proposed Transaction").

2.      On September 30, 2019, Dova entered into an agreement and plan of merger, (the "Merger Agreement"), whereby shareholders of Dova common stock will receive (i) $27.50 in cash for each share of Dova common stock they own (the "Closing Amount"), plus (ii) one contingent value right, (a "CVR"), which represents the right to receive $1.50, net to the seller in cash, without interest, pursuant to the terms of the Contingent Value Rights Agreement (the "CVR Agreement"), for each share of Dova common stock they own (the "Milestone Payment" and together with the Closing Amount, the "Offer Price").

3.      On October 11, 2019, in order to convince Dova's shareholders to tender their shares, the Board authorized the filing of a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the Securities and Exchange Commission ("SEC").  In particular, the Recommendation Statement contains materially incomplete and misleading information concerning: (i) the sales process; (ii) the fairness opinion and financial analyses performed by the financial advisors to the Company, Jefferies LLC ("Jefferies") and Evercore Group L.L.C. ("Evercore," and together with Jefferies, the "Financial Advisors"); and (iii) certain financial projections prepared by Dova and relied upon by the Financial Advisors.

4.      The Tender Offer is scheduled to expire one minute after 11:59 p.m., Eastern Time, on November 8, 2019 (the "Expiration Date").  It is imperative that the material information that has been omitted from the Recommendation Statement is disclosed to the Company's shareholders prior to the forthcoming Expiration Date so they may make an informed determination on whether to tender their shares.

5. For these reasons, and as set forth in detail herein, Plaintiffs seek to enjoin Defendants from closing the Tender Offer or taking any steps to consummate the Proposed Transaction, unless and until the material information discussed below is disclosed to Dova's shareholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391 as Plaintiff alleges violations of Sections 14(d)(4) and 14(e) of the Exchange Act.

7. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id*. at 1316.

8. Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Dova's common stock trades on the Nasdaq Global Market (the "Nasdaq"), which is headquartered in this District, rendering venue in this District

3

appropriate.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

9.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Dova's common stock.

10.     Defendant Dova is a Delaware corporation and maintains its principal executive office at 240 Leigh Farm Road, Suite 245, Durham, North Carolina 27707.  Dova is a pharmaceutical company focused on acquiring, developing and commercializing drug candidtates where there is a high unmet medical need, including Doptelet® (avatrombopag) ("Doptelet"), an orally administered thrombopoietin receptor agonist that Dova is developing for the treatment of thrombocytopenia across many different patient types.  The Company's common stock trades on the Nasdaq under the ticker symbol "DOVA".

11.     Defendant David Zaccardelli ("Zaccardelli") joined Dova as President and Chief Executive Officer and a director of the Company in December 2018.

12.     Defendant Steven M. Goldman ("Goldman") is, and has been at all relevant times, a director of the Company.

13.     Defendant Roger A. Jeffs ("Jeffs") is, and has been at all relevant times, a director of the Company.

14.     Defendant Paul B. Manning ("Manning") is, and has been at all relevant times, a director of the Company.

15.     Defendant Alfred J. Novak ("Novak") is, and has been at all relevant times, a director of the Company.

16.     Defendant Sean Stalfort ("Stalfort") is, and has been at all relevant times, a director

4

of the Company.

17.     Defendant Nancy Wysenski ("Wysenski") has been a director of the Company since June 2018.

18.     The defendants identified in paragraphs 11-17 are collectively referred to as the "Individual Defendants" or the "Board."

## SUBSTANTIVE ALLEGATIONS

### A.  Background and the Unfair Offer Consideration

19.     Dova is a pharmaceutical company that employs an aggressive approach to acquiring, developing, and commercializing drug candidates for diseases where this is a high unmet medical need.

20.     Dova focuses its resources and development principally on Doptelet®, which is approved by the U.S. Food & Drug Administration (the "FDA") for the treatment of thrombocytopenia in adults with chronic immune thrombocytopenia ("ITP") who have had an insufficient response to a previous treatment andfor the treatment of thrombocytopenia in adult patients with chronic liver disease ("CLD") who are scheduled to undergo a procedure.  Dova has also been granted marketing authorization for Doptelet by the European Commission for the treatment of severe thrombocytopenia in adult patients with CLD who are scheduled to undergo an invasive procedure.

21.     Dova was originally formed as PBM AKX Holdings, LLC, a limited liability company formed under the laws of the State of Delaware in March 2016, changed its name to Dova Pharmaceuticals, LLC in June 2016, and converted from a limited liability company to a corporation on September 15, 2016.  The Company went public with the issuance of its Initial Public Offering in June 2017.

21.     Since going public, Dova has been extraordinarily successful and it continues to be well-positioned for continued growth thanks to the recent approvals for Doptelet.  Indeed, on August 6, 2019 – less than two months before the Company announced that it was being acquired by Sobi – the Company issued a press release entitled *Dova Pharmaceuticals Reports Second Quarter 2019 Operating and Financial Results*, which stated in part:

> "The last few months have been a transformational period in Dova's history, with FDA approval and launch of our thrombopoietin receptor agonist (TPO-RA) DOPTELET for ITP, European approval of DOPTELET for severe thrombocytopenia in adult patients with CLD, and an expanded co-promotion partnership with Salix for CLD. ***These accomplishments have strengthened our position as a growing leader in the treatment of thrombocytopenia***," said Dr. David Zaccardelli, President and Chief Executive Officer of Dova. "***Beyond ITP, we look forward to results of our further indication expansion activities***, with top-line data from our Phase 3 trial of DOPTELET for the treatment of chemotherapy induced thrombocytopenia (CIT) expected in the first half of 2020."

22.     Indeed, on the August 6, 2019 conference call accompanying the release of these financial results, Zaccardelli explained that the "past few weeks have been incredibly productive and transformative," in large part because the Company had just obtained FDA approval for Doptelet's ITP indication in late June.  Zaccardelli concluded by emphasizing the "incredible progress" that Dova made in recent months and assuring the Company's investors that "dova has the people, product and resources necessary to deliver novel therapy to patients in need and create significant value for shareholders and increase our leadership in the treatment of thrombocytopenia.

23.     Thus, the Company had turned the corner and was finally beginning to unlock the commercial value in Doptelet, and the Proposed Transaction comes at a time when the Company's recent and future success was not fully reflected by its share price.  The Proposed Transaction will

cash-out Dova's stockholders at a price that fails to adequately compensate them for the intrinsic value of their shares.

24.     Despite Dova's intrinsic value and exceptional growth prospects, the Individual Defendants are agreeing to sell the Company and deprive its stockholders of the ability to partake in the Company's future growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Offer Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which has caused Plaintiffs and the Class to receive an inadequate Offer Consideration.

**B.      The Proposed Transaction**

25.     On September 30 2019, Dova announced the Proposed Transaction in a Press Release entitled *Dova Pharmaceuticals to be Acquired by Swedish Orphan Biovitrum AB (Sobi)*, which stated as follows:

> DURHAM, N.C., Sep 30, 2019 (GLOBE NEWSWIRE via COMTEX) -- --
> Consideration of up to $29.00 per share includes $27.50 per share in upfront cash and an additional $1.50 per share upon regulatory approval of DOPTELET for chemotherapy-induced thrombocytopenia (CIT) as a Contingent Value Right (CVR) for a total potential consideration of up to $915 million on a fully diluted basis
>
>> -- Acquisition of Dova expected to enhance Sobi's position as a leader in hematology and orphan diseases and maximize the availability of DOPTELET to patients globally
>
>> -- Transaction expected to be completed in Q4 2019
>
> Dova Pharmaceuticals, Inc. DOVA, -0.04% announced today it has entered into an agreement and plan of merger with Swedish Orphan Biovitrum AB (Sobi) (om:SOBI). Under the terms of the agreement, an indirect subsidiary of Sobi will commence a tender offer for all outstanding shares of Dova, whereby Dova stockholders will be offered an upfront payment for $27.50 per share in cash, along with one non-tradeable Contingent Value Right (CVR) that entitles them to an additional $1.50 per share in cash upon regulatory approval of DOPTELET for the treatment of chemotherapy-induced thrombocytopenia (CIT), representing a total potential consideration of $29.00 per share, or a total potential consideration of up to $915 million on a fully diluted basis.

The upfront consideration of $27.50 per share represents a premium of 36% to Dova's closing price on September 27, 2019 and a premium of 59% to the 30-day volume weighted average price. The transaction was unanimously approved by the Boards of Directors of both companies and is expected to close in the fourth quarter of 2019.

The proposed transaction is anticipated to enhance Sobi's position as a leader in hematology and orphan diseases and expand its presence in the United States. Additionally, Sobi intends to leverage its strong international presence to maximize the availability and commercial potential of DOPTELET globally.

"We are extremely pleased to announce this merger with Sobi, which we believe will continue the expansion of DOPTELET in the U.S., and provide the necessary resources to maximize DOPTELET's availability to patients in both the US and internationally," said David Zaccardelli, PharmD, President and Chief Executive Officer of Dova. "On behalf of the Board of Directors, I'd like to thank our employees and shareholders for their continued support and dedication to our mission of providing novel and effective therapeutic options for patients with thrombocytopenia; we believe Sobi is ideally positioned to continue that mission."

Guido Oelkers, PhD, President and Chief Executive Officer of Sobi, commented, "The cadence of upcoming launches and approvals across indications and regions that Doptelet provides, enables us to further accelerate growth in our haematology franchise. There is a large unmet medical need within thrombocytopenia and for us this is a great opportunity to be able to give patients access to new and improved treatments. Furthermore, we are excited to welcome the 125 professionals from Dova who will greatly strengthen Sobi's haematology infrastructure and broaden our value chain in the US."

Transaction Details

Under the terms of the agreement, an indirect subsidiary of Sobi will commence a tender offer for all outstanding shares of Dova, whereby Dova stockholders will be offered an upfront payment for $27.50 in cash, along with one non-tradeable CVR of $1.50 per share. The non-tradeable CVR will be paid upon the regulatory approval of DOPTELET for the treatment of CIT. There can be no assurance such approval will occur or that any contingent payment will be made.

Sobi will acquire any shares of Dova not tendered into the tender offer through a merger for the same per share consideration as will be payable in the tender offer. The merger will be effected as soon as practicable after the closing of the tender offer. Following completion of the merger, the common stock of Dova will no longer be listed for trading on the NASDAQ Global Select Market.

Dova will file a recommendation to shareholders recommending they tender their shares to Sobi, subject to the terms of the definitive merger agreement. Certain of the Company's major stockholders, including Paul B. Manning, representing a majority of the outstanding shares have entered into a Tender and Support Agreement committing

them to tender their shares into the tender offer. The transaction is subject to customary closing conditions, including the tender of more than 50% of all shares of Dova outstanding at the expiration of the offer and termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act.

26.     Rather than continuing to build upon Dova's improving prospects, the Offer Consideration being offered to Dova's public shareholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of Dova common stock is materially in excess of the amount offered given the Company's recent financial performance and its prospects for future growth and earnings.

## C.     The Preclusive Deal Protection Devices

27.     To the detriment of Dova shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

28.     The Merger Agreement contains a restrictive no-shop provision that prohibits the members of the Board from soliciting proposals relating to alternative offers or business combinations.

29.     The no-shop provision also prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to unsolicited proposals regarding alternative acquisitions or business combinations.

30.     Further, the Board must provide Sobi with written notice of any Acquisition Proposal and must provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Offer so that Sobi has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Offer.

Case 1:19-cv-09708   Document 1   Filed 10/21/19   Page 10 of 21

31.     In addition, the Merger Agreement provides that the Company will be required to pay to Parent a termination fee of $32,000,000.00 to Sobi with respect to any termination under the no-shop provisions.

32.     Ultimately, these preclusive deal protection devices restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for Dova shares in the Proposed Transaction, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

33.     Accordingly, Plaintiffs seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**D.      The Recommendation Statement Omits Certain Material Information**

   **(i)      The Recommendation Statement Contains Materially False Statements and Omissions Regarding the Process by Which the Board Agreed to Sell the Company**

34.     On Page 12, the Recommendation Statement states that Mr. Mark Hahn, Dova's Chief Financial Officer ("Hahn"), at the direction of the Dova Board, has engaged in "outreach to third parties with respect to Ex-US Licenses and entered into customary, commercial non-disclosure agreements with potential counterparties (including potential strategic partners) in order to facilitate discussions" with respect to licensing Doptelet outside of the United States ("Ex-US Licenses"), including a confidentiality agreement between Dova and Sobi that was dated January 15, 2018, which was later superseded by the Confidentiality Agreement between Dova and Sobi dated August 19, 2019.  Recommendation Statement, 4, 12.

35.     The Recommendation Statement states that the confidentiality and standstill agreements that Dova executed with Party B (on September 23, 2019), Party C (on August 16, 2019), Party D (on September 8, 2019), and Sobi (on August 19, 2019) with respect to a potential strategic combination included standstill "fallaway" agreements that released the potential third-party counterparties from their standstill obligations upon the announcement of the Proposed Transaction with Sobi.

36.     However, the Recommendation Statement fails to disclose whether one or more of the "customary, commercial non-disclosure agreements" that were made with respect to the Ex-US Licenses (including the Mutual NDA between Dova and Sobi dated January 15, 2018) also included standstill agreements and, if so, whether those standstill agreements also included "fallaway" provisions or otherwise include Don't Ask, Don't Waive ("DADW") provisions.

37.     This information is material to investors deciding whether to tender their shares pursuant to the Tender Offer because a reasonable investor would wonder whether Dova and Sobi entered the August 19, 2019 Confidentiality Agreement with the standstill fallaway provision with the express purpose of superseding a DADW standstill provision in the January 15, 2018 Mutual NDA entered to facilitate discussions of an Ex-US License rather than a strategic business combination.  Indeed, the Recommendation Statement states that, unlike the Mutual NDA, which was a "commercial confidentiality agreement," the August 19, 2019 Confidentiality Agreement was "specific to a potential transaction."  Recommendation Statement, 15.  As such, any investor would also wonder whether Dova had entered confidentiality agreements with other potential counterparties with respect to Ex-US Licenses that did not include standstill fallaway provisions or included DADW standstill provisions, and would further wonder whether such counterparties

continue to remain subject to standstill agreements that were entered to facilitate discussions with respect to Ex-US Licenses rather than a strategic acquisition.

### (ii)     The Recommendation Statement Contains False Statements and Omissions Related to the Management Projections and the Fairness Opinion

38.     The Recommendation Statement also omits material information regarding the Company's Financial Advisors' Fairness Opinion and the various valuation analyses that the Company's Financial Advisors performed to render the opinion because it does not provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion. Specifically, the Recommendation Statement does not disclose enough information regarding the financial projections, inputs and assumptions for various financial valuations, and the Financial Advisors' potential conflicts of interest. Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Offer Price is fair, or accurately assess the reliability of the Fairness Opinion. The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them. Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

39.     With respect to the management projections, the Recommendation Statement fails to disclose material information. With respect to these financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

40.     With respect to the Projected Financial Information beginning on Page 24, the Recommendation Statement fails to provide all of the financial projections provided by Dova and

relied upon by the Financial Advisors for purposes of the fairness analyses. Specifically, the Recommendation Statement does not provide projections for (i) adjusted depreciation & amortization, (ii) capital expenses, (iii) changes in net working capital, (iv) taxes (or tax rate), (v) stock-based employee compensation, or (vi) any other line items used in deriving the projected after-tax unlevered free cash flows. Indeed, given that the projected free cash flow amounts that were arithmetically derived by Jefferies differ greatly from the projected free cash flow amounts that were arithmetically derived by Evercore even though Jefferies and Evercore ostensibly derived these projected free cash flows from the same Projected Financial Information, the underlying components of those free cash flows would be material information for any reasonable investor deciding whether or not to tender their shares pursuant to the Tender Offer.

41.     Further, it appears that the unlevered free cash flow projections arithmetically derived by Jefferies and Evercore were based on a set of projections that were not disclosed to the shareholders rather than the Management Projections provided on Page 25 of the Recommendation Statement. *See,* Recommendation Statement, 16 ("Hahn then provided a detailed overview to the Dova Board of the projections and underlying assumptions prepared by Dova's management *relating to the commercialization of Doptelet,* as described in more detail in the section of this Schedule 14D-9 titled "—*Projected Financial Information,*" in connection with Dova's consideration of strategic opportunities. Following discussion, the Dova Board authorized and directed Jefferies to use *these assumptions* . . . ."). Indeed, it appears that the Management Projections provided on Page 25 pertain only to the financial information that is projected to be related to the commercialization of Doptelet, and that the future cash flows derived by Jefferies and Evercore were based on projected revenue and expenses pertaining to other revenue streams as well. Indeed, each of Jefferies and Evercore derived 2030 Fiscal Year free cash flows that

greatly exceeded the 2030 Fiscal Year Total Revenue stated in the Management Projections table, indicating that the free cash flow projection amounts stated on Page 25 may have been arithmetically derived from a set of financial projections that was provided to and relied upon by the Financial Advisors but withheld from Dova's public shareholders.

42.     The Recommendation Statement also omits material information regarding the Financial Advisors' Fairness Opinion and the various valuation analyses performed to render that opinion.  The description of the Fairness Opinion fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.

43.     With respect to Jefferies' *Selected Public Companies Analysis* beginning on page 30, the Recommendation Statement fails to disclose: (i) the criteria that Jefferies' relied on in selecting the companies as "generally relevant," (ii) the individual companies' revenue multiples, (iii) the enterprise values implied for each individual company based on its trading multiples, and (iv) any individual companies' earnings multiples, assuming that any of the selected companies is actually projected to produce positive earnings during any of years included in the analysis, as Jefferies anticipated that Dova would be generating positive free cash flows by Fiscal Year 2022. Without this information, it is impossible for the Company's public shareholders to know whether the *Selected Public Companies Analysis* undervalues Dova by relying on revenue multiples of companies that are not actually comparable to Dova.  *See, e.g., In re PNB Hldg. Co. S'holders Litig.*, 2006 Del. Ch. LEXIS 158, 2006 WL 2403999, at *25 n.125 (Del. Ch. Aug. 18, 2006) (rejecting comparable companies analysis where the "comparable publicly-traded companies all were significantly larger than [the subject company], with one having total assets of $587 million as compared to [the subject company's] assets of $216 million").

44.     With respect to Jefferies' *Discounted Cash Flow Analysis* (DCF) beginning on Page 31, the Recommendation Statement fails to disclose: (i) the rationale and basis for selecting a discount rate range of 11.7% to 12.7%, (ii) the rationale and basis for selecting a perpetutity growth rate range of (20.0%) to 0.0%, (iii) whether stock-based compensation was treated as a cash or non-cash expense, and (iv) a full sensitivity table based on the entire range of discount and growth rates.  Without this information, it is impossible to determine whether the discounted cash flow analysis actually provides a reasonable range for the Company's intrinsic value.  Indeed, a banker can make any transaction seem "fair" simply by changing the inputs and assumptions to project and discount future cash flows below the present value of the merger consideration.

45.     With respect to Jefferies' premium paid analysis beginning on Page 31 of the Recommendation Statement, the Recommendation Statement fails to disclose: (i) the number of transactions analyzed, (ii) Jefferies' basis for including transactions with consideration based on a cash/stock mix as long as the cash component was 80% of the total consideration, and (iii) whether the implied consideration in the Proposed Transaction would have fallen outside of the reference range if Jefferies had excluded cash/stock mix mergers.  This information is material to investors because the reference range implied by the results of the premium analysis, *i.e.,* $25.65 to $36.14 per share, suggesting the implied value of the Offer Price, *i.e.,* $28.43, may not be adequate.  *See, In re Nationwide Health Props. S'holder Litig.*, No. 24-c-11-001476, 2011 Md. Cir. Ct. LEXIS 3, at *30-32 n.14 (Md. Cir. Ct. May 27, 2011) (explaining that, all else being equal, a greater premium would be paid in a cash-out merger than in a stock-based merger).

46.     With respect to Evercore's *Selected Public Company Trading Analysis* beginning on page 35, the Recommendation Statement fails to disclose: (i) the criteria that Evercore relied on in selecting the companies as "generally relevant," (ii) the individual companies' revenue

multiples, (iii) the enterprise values implied for each individual company based on its trading multiples, and (iv) any individual companies' earnings multiples, assuming that any of the selected companies is actually projected to produce positive earnings during any of years included in the analysis, as Evercore anticipated that Dova would be generating positive free cash flows by Fiscal Year 2023.   Without this information, it is impossible for the Company's public shareholders to know whether the *Selected Public Company Trading Analysis* undervalues Dova by relying on revenue multiples of companies that are not actually comparable to Dova.

47.   With respect to Evercore's *Selected Transactions Analysis* beginning on Page 37, the Recommendation Statement fails to disclose: (i) Evercore's rationale and basis including transactions valued between $250 million and $1 billion when the implied aggregate value of the Proposed Transaction is about $900 million based on Evercore's implied merger consideration of $28.42 per share, (ii) the premium paid in each transaction, (iii) whether any of the transactions analyzed were stock-mergers and if so, which ones, and (iv) whether Evercore made any attempt to account for "disturbances" to stock price that occurred prior to the announcement of a transaction, for example a "jump" in stock price that occurred because a company announced that it was anticipating a merger before any merger was, in fact, finalized.  *See, e.g., In re Columbia Sec. Litig.*, 155 F.R.D. 466, 483 (S.D.N.Y. 1994) ("The fact that Columbia stock jumped 25 percent when Columbia finally announced in September 1989 that it was engaged in acquisition discussions with an unannounced suitor is convincing evidence that whatever 'acquisition expectations' were previously built into Columbia stock before this date were less than fully confident ones.")  Without this information the Company's public stockholders have no way to know whether the premium ranges that Evercore selected fairly represent the results of the *Selected Transaction Analysis* or whether this premium range effectively undervalues the Company.

48.     With respect to Evercore's *Discounted Cash Flow Analysis* beginning on Page 38, the Recommendation Statement fails to disclose: (i) the rationale and basis for Evercore's selected discount rate range of 11.0% to 13.0%, (ii) the rationale and basis for Evercore's selected perpetuity growth rate range of (15%) to (5%), (iii) whether stock-based compensation was treated as a cash or non-cash expense, and (iv) a full sensitivity table based on the entire range of discount and perpetuity growth rates.  Without this information, it is impossible to determine whether the discounted cash flow analysis actually provides a reasonable range for the Company's intrinsic value.  Indeed, a banker can make any transaction seem "fair" simply by changing the inputs and assumptions to project and discount future cash flows below the present value of the merger consideration.

49.     With respect to Evercore's *Equity Research Analyst Price Targets* analysis beginning on Page 39, the Recommendation Statement states that Evercore observed targets ranging from $16.00 to $45.00 per Share, with a median and mean price target of $27.00 and $28.00 per share but fails to disclose: (i) the individual price targets observed, and (ii) the date that those targets were published.  Without this information, it is impossible to tell whether the price targets' range, median, and mean present an accurate picture of analysts' impression of Dova at the time the Proposed Transaction was announced.

## COUNT I
### (Against All Defendants for Violation of Section 14(e) of the Exchange Act)

61.     Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

62.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

63.     Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the Tender Offer.  Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64.     The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the consideration offered to shareholders via the Tender Offer and the intrinsic value of the Company.

65.     In doing so, Defendants made untrue statements and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e).  The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

66.     The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares.  In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as

altering the "total mix" of information made available to shareholders.

67.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

68.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiffs, and Plaintiffs will be deprived of her entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

**<u>COUNT II</u>**
**(Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act and SEC
Rule 14d-9, 17 C.F.R. § 240.14d-9)**

69.     Plaintiffs incorporates each and every allegation set forth as if fully set forth herein.

70.     Defendants have caused the Recommendation Statement to be issued with the intention of soliciting shareholder support of the Proposed Transaction.

71.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.  Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security
> to accept or reject a tender offer or request or invitation for tenders
> shall be made in accordance with such rules and regulations as the
> Commission may prescribe as necessary or appropriate in the public
> interest or for the protection of investors.

72.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the

Exchange Act, provides that:

> Information required in solicitation or recommendation. Any
> solicitation or recommendation to holders of a class of securities
> referred to in section 14(d)(1) of the Act with respect to a tender
> offer for such securities shall include the name of the person making
> such solicitation or recommendation and the information required
> by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair
> and adequate summary thereof.

73.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's

directors to:

> Furnish such additional information, if any, as may be necessary to
> make the required statements, in light of the circumstances under
> which they are made, not materially misleading.

74.     The omission of information from a recommendation statement will violate

Section 14(d)(4) and Rule 14d-9 if other SEC regulations specifically require disclosure of the

omitted information.

75.     The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9

because it omits material facts, including those set forth above, that render the Recommendation

Statement misleadingly incomplete.  Defendants knowingly or with deliberate recklessness

omitted the material information identified above from the Recommendation Statement, causing

certain statements therein to be materially incomplete and therefore misleading.  Indeed, while

Defendants undoubtedly had access to and/or reviewed the omitted material information in

connection with approving the Proposed Transaction, they allowed it to be omitted from the

Recommendation Statement, rendering certain portions of the Recommendation Statement

materially incomplete and therefore misleading.

76.     The misrepresentations and omissions in the Recommendation Statement are

material to Plaintiffs, and Plaintiffs will be deprived of her right to make a fully informed decision

if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs prays for judgment and relief as follows:

A.    Preliminarily enjoining Defendants and all persons acting in concert with them

from proceeding with the Tender Offer or taking any steps to consummate the Proposed

Transaction, until the Company discloses the material information discussed above which has been

omitted from the Recommendation Statement;

B.    Rescinding, to the extent already implemented, the Merger Agreement or any of

the terms thereof, or granting Plaintiff rescissory damages

C.    Directing the Defendants to account to Plaintiff for all damages sustained as a result

of their wrongdoing;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 21, 2019

**OF COUNSEL:**
**ADEMI & O'REILLY, LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
      jfruchter@ademilaw.com

**MONTEVERDE & ASSOCIATES PC**
  */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building 350 Fifth
Avenue, Suite 4405 New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*